1    UNITED STATES DISTRICT COURT
2    DISTRICT OF PUERTO RICO
3
4    FERDINAND CABRERA-RUIZ and
5    JANET CABRERA-RUIZ,
6
7         Plaintiffs,                          Civil No. 10-1865 (JAF)
8
9         v.
10
11   ROCKET LEARNING, INC., JAIME
12   PALES, HIRAM PEREZ, and BRENDA
13   PEREZ,
14
15        Defendants.
16
17

18                        **OPINION AND ORDER**

19        Plaintiffs bring this action against Defendants alleging age discrimination in violation

20   of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634.  (Docket

21   No. 1 at 2.)  Plaintiffs also bring supplemental claims under various Commonwealth statutes,

22   including Puerto Rico Law 80 ("Law 80"), 29 L.P.R.A. § 185; Puerto Rico Law 100 ("Law

23   100"), 29 L.P.R.A. § 146; Puerto Rico Law 115 ("Law 115"), 29 L.P.R.A. § 194; and the

24   Puerto Rico Workmen's Accident Compensation Act ("PRWACA"), 11 L.P.R.A. §§ 1–42.

25   (Id.)  Defendants move for summary judgment under Federal Rule of Civil Procedure 56.

26   (Docket Nos. 53; 56.)  Plaintiffs oppose.  (Docket Nos. 67; 68.)  Defendants respond.

27   (Docket Nos. 81; 86.)

28

Civil No. 10-1865 (JAF)                                                        -2-

**I.**

**Factual Synopsis**

1

2

3  After an exhaustive examination of Plaintiffs' responses (Docket Nos. 67-1, 68-1),

4  we find that Plaintiffs have failed to contest Defendant's statements of uncontested facts

5  properly under Local Rule 56(c) and (e), which requires the nonmoving party to submit a

6  "separate, short, and concise statement of material facts [that] shall admit, deny or qualify

7  the facts supporting the motion for summary judgment . . . . [they] shall support each denial

8  or qualification by a record citation as required by this rule." D.P.R.R. 56(c).  For the most

9  part, Plaintiffs' denials and qualifications lack proper record citations as required by Local

10  Rule 56(e), which requires inclusion of a "specific page or paragraph of identified record

11  material supporting the assertion. "[1] D.P.R.R. 56(e).  While Plaintiffs' separate statements

12  of material facts do largely include adequate record citations, the First Circuit "has previously

13  held that submitting an 'alternate statement of facts,' rather than admitting, denying, or

14  qualifying a defendant's assertions of fact 'paragraph by paragraph as required by Local Rule

15  56(c),'" does not meet the requirements of the rule.  Mariani-Colon v. Dep't of Homeland

16  Sec., 511 F.3d 216, 219 (1st Cir. 2007) (quoting Hernandez v. Philip Morris USA, Inc., 486

17  F.3d 1, 7 (1st Cir. 2007)).  Furthermore, "Plaintiffs' denials and qualifications are either

18  irrelevant to the matter at hand, add facts that should have been filed in a separate statement,

19  or consist of mere 'speculation, generalities, conclusory assertions, improbable inferences,

---

[1] For example, Mr. Cabrera only admits one complete statement of fact in his response, and only five statements out of the forty-five subjected to denial or qualification contain proper record citations.

1    and, for lack of a better phrase, a lot of 'hot air.'"[2]  <u>Gomez-Gonzalez v. Rural Opportunities</u>,

2    Inc., 658 F. Supp. 2d 325, 336 n.2 (D.P.R. 2009) (quoting <u>Dominguez v. Eli Lilly and Co.</u>,

3    958 F. Supp. 721, 738 (D.P.R. 1997)). Plaintiffs submit their own additional statement of

4    material facts, which adds few new facts to the record but does offer unsupported and

5    conclusory statements.  (Docket Nos. 67-1; 68-1.)  In turn, Defendants also fail to include

6    proper record citations with the majority of their responses to Plaintiffs' fact statements.

7    (Docket Nos. 82; 84.)

8         Therefore, we cull most of the relevant facts from Defendants' statements of

9    uncontested facts, in addition to any properly supported statements from Plaintiffs' additional

10   statements of contested facts that are not properly contested by Defendants.  <u>Id.</u> at 328 n.2.

11   Of course, we will take into account the few instances where Plaintiffs do properly controvert

12   one of Defendants' statements of fact.

13   **A.    <u>Ferdinand Cabrera</u>**

14        Coplaintiff Ferdinand Cabrera-Ruiz ("Mr. Cabrera") worked for codefendant Rocket

15   Learning from February 2005 until May 2009.  (Docket No. 51 at 2, 11.)  Codefendants

16   Hiram Pérez ("H. Pérez") serves as Rocket Learning's president, codefendant Jaime Palés

17   ("Palés") as vice president, and Brenda Pérez ("B. Pérez") as the supplementary educational

---

[2] We remind the attorneys that the unreasonable denial of statements of facts and pointless obfuscation of the facts does not serve their clients' best interests.  Beyond the failure to comply with Local Rule 56(c), potentially meritorious points have been lost in a sea of absurd qualifications and nonsensical denials.  For example, Plaintiffs seem unable to resist qualifying anything and everything, including the fact that H. Pérez is actually "6 years 6 months younger than the Plaintiff," as opposed to simply "six (6) years younger than F. Cabrera," as Defendants state.  (Docket Nos. 67-1 at 2; 51 at 2).

1   services director for Rocket Learning—she was also Plaintiff's former supervisor.[3]  (Docket

2   Nos. 51 at 1–2; 12 at 1–2.)

3         Ferdinand Cabrera, born on May 11, 1965, was thirty-nine years old when he was

4   hired by H. Pérez and Palés for the position of Program Manager at Rocket Learning.

5   (Docket Nos. 51 at 2; 67 at 21.)  In August 2005, he was promoted to Senior Program

6   Manager (the position now called "Regional Director") at the age of forty.  (Docket Nos. 51

7   at 3; 51-1 at 2.)  His earnings from his salary and commissions increased yearly.[4]  (Docket

8   No. 51 at 3.)  Mr. Cabrera states that at a meeting in 2007, Palés commented that the

9   company needed "younger blood" in front of other employees, and that while phrased in

10  general terms, Mr. Cabrera understood the comment to mean that Rocket Learning "only

11  wanted young employees."[5]  (Docket Nos. 51 at 4; 67-1 at 4.)

12        Plaintiff was never demoted from his position, but in 2007, Palés told Mr. Cabrera that

13  he had to transfer from the Arecibo region, where he lived, to the Ponce region because three

14  employees in the Arecibo region had accused Mr. Cabrera of pregnancy discrimination.[6]

---

[3] H. Pérez was born on December 21, 1971; Palés was born on June 8, 1971; B. Pérez was born on December 21, 1965.  (Docket No. 54 at 2.)

[4] His salary and commissions increased from $42,655 in 2006 to $59,029 in 2007 to $81,582 in 2008. He also received a car allowance.  (Docket Nos. 51 at 3; 51-7.)  The parties disagree as to whether his gasoline allowance was also raised sufficiently.  (Docket Nos. 51 at 6; 67-1 at 22; 84 at 22.)

[5] Defendants state that "for the purposes of this Motion for Summary Judgment, [the remarks and actions that Mr. Cabrera allege as discrimination] will be addressed as uncontested."  (Docket No. 53 at 7.)

[6] For example, Mr. Cabrera inexplicably "denied as stated" the statement that Jaime Palés told him that three employees accused him of pregnancy discrimination, by pointing to (a paragraph in his separate statement of contested facts, which in turn points to his very own deposition testimony, in which Mr. Cabrera clearly states that "[Pales] told me that I was being accused for discrimination due to pregnancy, that it was

1  (Docket Nos. 51 at 4; 67-1 at 20; 67-3 at 46.)  Palés did not interview or verify the

2  accusations with anyone outside of the regional office; five of the six employees had repeated

3  the accusation.[7]  (Docket No. 67-9 at 72.)

4        Mr. Cabrera accepted the offer to move in late July of 2007, and he testified that his

5  age was not a principal factor in August 2007.  (Docket Nos. 51 at 4; 51-12 at 1; 51-3 at 2.)

6  He states that he complained about the transfer and the lack of support in Ponce to H. Pérez,

7  who responded by calling Mr. Cabrera an old person who should be able to work alone.

8  (Docket No. 67-1 at 21.)  On March 28, 2008, Mr. Cabrera wrote an email to his superiors,

9  including Palés and B. Pérez, offering his availability for any additional duties.  (Docket

10  Nos. 51 at 4; 67-1 at 7.)  In June of 2008, Mr. Cabrera was temporarily assigned for four

11  weeks to supervise the Caguas Regional Office.[8]  (Docket Nos. 51 at 5; 67-1 at 7.)

12        In August of 2008, Mr. Cabrera was transferred to the Bayamón region to replace B.

13  Pérez as Regional Director after her promotion to supplementary educational services

---

three employees in the region . . ."  (Docket Nos. 67-1 at 13; 65-6 at 1.)

[7] In his alternative statement of facts, (Docket No. 67-1 at 20) Mr. Cabrera, citing his own deposition, asserts that this accusation was fabricated because there was no further investigation surrounding the complaint and because he was not provided with a copy of the complaint.  The complaint, however,  was made verbally.  (Docket No. 67-9 at 72.)  We note that we will not accept as fact "subjective beliefs when they are not factually based and merely constitute conclusory, self-serving statements."  Torrech-Hernandez v. GE, 519 F.3d 41, 48 n.1 (1st Cir. 2008).  Mr. Cabrera testified that in August of 2008, after filing his EEOC complaint, Mr. Palés told him there was "never a complaint" because the employee had not pursued it or retracted it.  (Docket No. 67-1 at 21.)

[8] Mr. Cabrera stated, at his deposition, that he did not agree with the reassignment, but he felt that he had no other options.  (Docket No. 51-14 at 2–3.)  He testified that his traveling expenses and hours worked increased (to about 70 hours per week).  (Docket No. 67-1 at 23.)

1    director.[9]  The Bayamón region had never had a standalone office, and operated out of the

2    company's Hato Rey office prior to Mr. Cabrera's transfer.  (Docket Nos. 51-1; 67-1.)

3           Mr. Cabrera testified that attempts by Defendants to force his resignation began with

4    the events of August 2008.  (Docket No. 67-1 at 9.)  Specifically, Mr. Cabrera testified that:

5    (1) he was given "unreasonable quotas and was assigned [to supervise employees] without

6    experience," (2) B. Pérez "would call upon his subordinates and this was not part of her

7    functions," (3) Mr. José Vargas threatened to give marketing materials designated for

8    Bayamón to another region, and (4) when Palés first introduced him to the Bayamón team

9    at a meeting, it was a cold environment and his colleagues would not look him in the eyes.

10   (Docket Nos. 51 at 6; 67-1 at 9–10.)  On August 15, 2008, Mr. Cabrera emailed Palés and

11   B. Pérez requesting an increase in his travel allowance.  (Docket No. 51 at 6.)  Around the

12   time of Mr. Cabrera's transfer to Bayamón, Rocket Learning increased his salary and

13   gasoline expenditure.  (Id.)  He felt this was an insufficient increase, but felt that he had to

14   meet a quota that was disproportionate compared to other regions because his employees

15   were new and inexperienced.  (Docket No. 67-1 at 24–25.)

16          In October of 2008, Mr. Cabrera sent an email to various Rocket Learning employees

17   congratulating the Ponce Region team—which he supervised prior to his transfer to

18   Bayamón—on their recently improved performance.  (Docket Nos. 51 at 6, 51-22 at 1–2; 67-

19   1 at 11.)  Mr. Cabrera testified that in response, H. Pérez chastised him for sending a letter

---

[9] The parties disagree as to whether Defendants promised—or merely stated "they would try"—to give Mr. Cabrera his own regional office for Bayamon.  (Docket Nos. 51 at 5; 67-1 at 8.)

to a team that was not his own, and told him that "he was an old man and that the letter was a ridicule, [sic] a blooper . . ." in a tone he perceived to be hostile and humiliating.[10] (Docket Nos. 51 at 7; 67-1 at 11.)  Mr. Cabrera also says that H. Pérez told him he had to dismiss employees due to lack of funds and that trying to find employment at his age would be difficult.  (Docket Nos. 51 at 7; 67-1 at 11.)

On October 15, 2008, the entire Bayamón team complained about Mr. Cabrera's supervisory skills and performance, explaining that they had lost the enrollment of many schools due to his inaction.[11]  (Docket Nos. 51 at 7; 51-23.)  In November 2008, Mr. Cabrera discussed a situation involving an employee with B. Pérez, who told him that "old people have to be strong with young employees because otherwise he was going to get wiped out." (Docket No. 51 at 7–8 (citing Docket No. 51-24).)

Mr. Cabrera stated that he had a second meeting with H. Pérez in November 2008 regarding the letter he had sent to the Ponce team.  H. Pérez told him that he was "considering his removal as Regional Director" of Bayamón because of the problems with his leadership, but that he would give him time to try to improve the situation.  (Docket Nos. 51 at 7–8; 67-1 at 27.)  Palés told him his new team was young and needed a "young

---

[10] Mr. Cabrera attempts to deny this specific statement in his response (without proper record citations) by alleging that he also sent a similar letter of congratulations to his own team in Bayamón around the same time.  (Docket No. 67-1 at 11.)  Beyond the missing record citations, this statement does not actually constitute a denial; whether or not he <u>also</u> sent his own team a letter is immaterial to whether or not he sent the Ponce team a letter.

[11] Plaintiff, without citing anything in the record beyond his own deposition, characterizes this as a plot designed to force his resignation.

1    leader." (Docket No. 51 at 7.)  Finally, Mr. Cabrera met with Palés, who told him that the

2    "letter was ridiculous, that he was old, and" he shouldn't have sent the letter to the Ponce

3    team.  Palés also told Mr. Cabrera that he was paranoid and needed psychiatric treatment.

4    (Id. at 7–8.)  However, at the time of this meeting, Mr. Cabrera says that felt that he could

5    continue to work and had other options apart from resignation.  (Id.; Docket No. 51-27.)

6          On December 8, 2008, B. Pérez sent Mr. Cabrera an email regarding various

7    unanswered communications and questions that she had previously sent him.[12]  (Docket

8    No. 51 at  8.)  Mr. Cabrera replied to her on December 11, 2008.  (Id.)  Later that day, Palés

9    emailed Mr. Cabrera regarding his response explaining that Regional Directors had to be in

10   the office if they were not out in the field and that B. Pérez was not asking him to do this out

11   of caprice or a hidden agenda.  (Docket Nos.  51 at 8; 84-2.)

12         On December 12, 2008, Mr. Cabrera applied for benefits from the State Insurance

13   Fund ("SIF").  (Docket Nos. 51 at 8; 51-30.)   At the SIF, Mr. Cabrera cited cervical spasms,

14   shoulder and neck pain, depression, and insomnia due to stress as the reason for his visit; the

15   psychologist's initial report described him as coherent, calm, sociable, happy; and not

16   suffering from any emotional condition.  (Docket Nos. 51 at 9; 51-30; 51-31; 65-27.)

17   Mr. Cabrera told the psychologist that his physical symptoms were likely due to the nature

---

[12] The inquiries concerned 1) why he had not reported daily to his office, as all Regional Directors were requested to do; 2) how he planned to deal with two employees on leave; and 3) requested information about additional schools.  (Docket Nos. 51 at 8; 51-29.)  Plaintiff testified that he met with his team in Bayamón or the surrounding areas, not at the office in Hato Rey, which was not part of the region.  (Docket No. 67-1 at 28.)

1    of his travels and the office work for his job.[13]  (Docket Nos. 51 at 9; 51-31; 65-27.)  The

2    psychologist's initial report and the emotional condition evaluation form do not contain any

3    mention of specific problems or discrimination at work.  (Docket Nos. 51 at 9; 51-31; 65-27.)

4    On January 15, 2009, the SIF psychologist noted that he remained happy, coherent, sociable,

5    calm, and without an emotional condition; discharge from the SIF was recommended.

6    (Docket Nos. 51-31; 65-27 at 2.)  After the doctors ordered rest for Mr. Cabrera on his

7    December 12 visit to the SIF, Mr. Cabrera did not return to work again.  (Docket Nos. 51-35;

8    65-31; 67-7 at 216.)

9            On January 15, 2009, Mr. Cabrera sent a seventeen-page letter to Palés, detailing all

10   of the perceived injustices and adverse actions he suffered at Rocket Learning and, while he

11   made no mention of age or age discrimination, he <u>did</u> mention discrimination due to <u>family</u>

12   <u>or social origin</u>.  (Docket No. 65-28 at 16.)  But Mr. Cabrera later testified that he did not use

13   the word "discrimination" because "he was afraid and not emotionally prepared . . . ."

14   (Docket No. 67-1 at 30.)  He did not receive a response to his concerns in the letter.  (<u>Id.</u>)

15   Mr. Cabrera stated that he experienced the last "discriminatory" act on January 15, 2009,

16   when he was informed that he had used up all his remaining sick days.  (Docket No. 51 at 11;

17   67-1 at 19.)  Mr. Cabrera testified that as of that date he understood there was a possibility

18   that he could return to the duties of his position.   (Docket Nos. 51 at 10; 51-33.)

---

[13] The only additional checked box for symptoms on his emotional condition evaluation was anxiety. (Docket No. 51-31 at 41.)  The emotional condition evaluation form does not contain any mention of specific problems or discrimination at work.  (Docket Nos. 51 at 9; 51-31; 65-27.)

1    After submitting unanswered claims in April for commissions that he felt Rocket

2    Learning unfairly withheld from him,[14] on May 5, 2009, Mr. Cabrera received copies of

3    emails that, he alleged, demonstrated a scheme between B. Pérez and two of his employees

4    "to discredit him in an effort to make him quit."[15]   (Docket Nos. 51 at 10; 51-34; 65-30.)

5    Mr. Cabrera had not returned to work since his SIF appointment, but he and Ms. Cabrera

6    emailed their brief, but dramatic, joint letter of resignation on May 6, 2009.  (Docket Nos. 51

7    at 10; 65-31.)  No mention of discrimination was made in that letter.

8    **B.    Janet Cabrera**

9    Rocket Learning hired Ms. Cabrera in 2005 for the position of Program Manager for

10   the Arecibo region at the age of thirty-seven; Mr. Cabrera, her brother and coplaintiff, was

11   her direct supervisor.[16]   (Docket No. 54 at 3.)  In her spare time and weekends, she ran a

---

[14] On April 28, 2009, Mr. Cabrera claimed that he had been underpaid for his work in Caguas and Ponce for the 2007-2008 school year.  He was paid commissions for Ponce at a rate of .5%, but felt that he was due more money, since he he was paid commissions for his work in Arecibo for the 2006-2007 cycle at a .6% rate.  (Docket Nos. 51 at 10–11; 65-33.)  These commissions, or bonuses, had an element of discretion, and only two out of the six Regional Directors received the .6% rate; the other four, including Mr. Cabrera, received the .5% rate.  (Docket Nos. 51 at 11; 51-5; 65-32.)

[15] Plaintiffs refer to incriminating emails by and/or implicating B. Pérez, but we could not locate them in the record.  The only such email in the record comes from Javier Reyes, dated May 5, 2009, and discussing, in hyperbolic and theatrical terms, a plot to get rid of Plaintiffs and a theatrical plea for everyone to get along with each other. (Docket No. 67-17.)  But this unauthenticated, unsworn document cannot be relied upon for summary judgment.  Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 666 (1st Cir. 2010).  Plaintiffs do also submit a brief excerpt of Mr. Reyes's deposition, but it contains no mention of the email or alleged complot.  Nor have Plaintiffs established his position at the company, which region he worked in, or the length of his employment; thus, they have not shown whether he had authority to speak for Rocket Learning as an agent or whether the topic fell within the scope of his employment.  See Id. (rejecting unauthenticated email as inadmissible at summary judgment).

[16] Ms. Cabrera was born on August 14, 1968.  She was interviewed by Palés and H. Pérez for the position.  (Docket No. 54 at 3.)  Defendants also state that she "is a former model and modeling teacher . . . who claims to be up-to-date with the latest fashion trends. . . ." (Id.)  She denies that she claims to be up-to-

1    modeling agency.  (Id.)   After the accusations of pregnancy discrimination against her

2    brother and his subsequent transfer to Ponce in August of 2007, she felt disappointed and

3    indignant because she believed the accusations to be false.  (Docket Nos. 54 at 4–5; 68-1 at

4    22.)   She testified that she received threats after requesting a meeting to clarify the

5    accusations, and she felt that she could not communicate with her colleagues.  (Docket

6    Nos. 54 at 5; 54-15.) After her brother's transfer, Ms. Cabrera asked Palés to be appointed

7    Regional Director for the Arecibo region because she had the most seniority in the region.

8    (Docket Nos. 54 at 4; 68-1 at 4.)  Palés then responded that another Program Manager,

9    Héctor Báez ("Báez"), would be Regional Director because he was a young man who had

10   worked excellently with B. Pérez; she later admitted that she did not know if she was ever

11   being considered for the position.  (Docket Nos. 54 at 4–5; 68-1 at 4.)  Báez is, in fact,

12   slightly older than Ms. Cabrera.[17]  (Docket No. 54 at 5.)   Ms. Cabrera testified that some

13   younger, less senior, and underperforming employees were receiving higher salaries and

14   benefits than her, but based on the record before this court, she was actually consistently one

15   of the highest-paid Program Managers.[18]  She also testified that at the beginning of 2007, she

---

date on fashion trends.  We are puzzled as to why Defendants felt the need to include this information, especially in light of the dearth of information on her brother's appearance and fashion sense in their corresponding statement of material facts for Mr. Cabrera.  Defendants also include two photographs of Ms. Cabrera as an exhibit.  (Docket No. 54-13.)

[17] Báez was born on June 30, 1968.  Plaintiffs, without any record citations, purport to deny this fact (his birth date), claiming that he "looks much younger than" Ms. Cabrera.  She did testify that he looked younger than her, which Defendants deny. (Docket No. 68-1 at 21.)

[18] Ms. Cabrera clarifies by pointing to one younger, less senior Program Manager who had the same salary and car allowance as her, and who, for one semester, made .20% more in commissions than Plaintiff.

1   was awarded the bonus with the highest commission rate because her achievements met the

2   expectations to reach that Commission percentage.  (Docket Nos. 54 at 7; 54-18; 84 at 5; 84-

3   4.)

4          Ms. Cabrera testified that—before her fortieth birthday—Báez exhibited a hostile

5   attitude towards her and would conduct meetings with the Arecibo team without inviting her;

6   she testified that she knew because she saw her coworkers' cars outside of the office while

7   driving by, and then Báez would call her afterward to inform her about the topics discussed.

8   (Docket Nos. 54 at 7—8; 54-19; 68-1 at 7.)  She stated that the few times she went to the

9   office to pick up materials, Báez met her at the door and told her "alright you have it, you can

10  go."  (Docket No. 68-1 at 23.)  She testified that when she requested a copy of the office key,

11  Báez did not give her one, even though other Program Managers had copies.[19]  (Id. at 24.)

12  She testified that she could not say if this was because of her age per se, but she started to

13  feel discriminated against because she did not have keys.  (Docket No. 78-1 at 19.)  She also

14  testified that, at the Hatillo office, she did not know whether she had her own desk or not

15  because Báez was there, in addition to the five Program Managers—and there were only five

16  desks.  (Id. at 2.)   She testified that she worked out of her modeling agency office, also in

_____

(Docket No. 68-1.)  In her answers to Interrogatories, she says that she requested the same salary and gasoline costs granted to younger Program Managers.  (Id. at 22.)  We also accept her statement of fact (because it has a proper record citation) that for the second semester and summer for the 2006–2007 term, she made the same commission rate as the other Program Managers, several of whom were younger than her.  (Docket No. 68-1 at 23.)

[19] Defendants deny this statement of material fact, but do not provide proper record citations.

1  Hatillo, where she had her own desk and chair. (Id. at 10.) She testified that because she had

2  no keys, Báez left checks for teachers under her supervision in the mailbox, and that she had

3  no access to the office photocopy machine, internet, or files; she had to get reimbursed for

4  copies and keep her files at her modeling agency office. (Docket No. 68-1 at 54.)

5         Before her fortieth birthday, in "the summer of 2007 and 2008, she had to endure

6  mockeries and jokes from her peers, Yanice Román and Kitzamar Agosto, regarding her age;

7  the latter said 'the marks in her arms were not freckles, but age spots' and also stated on three

8  or four different occasions that 'Janet believes she is a young person.'" (Docket No. 54 at

9  8.) She testified that another Project Manager stated once that "she wore jeans to look

10 younger" and that these comments were made in front of Báez. (Id.) She told Báez that she

11 felt uncomfortable around the team, but did not mention the remarks. (Docket Nos. 54 at 8;

12 54-21.) She did not mention the comments or her feelings to her supervisors H. Pérez or

13 Palés, because she "felt intimidated." (Docket Nos. 54 at 8; 54-21.)

14        Like her brother, Ms. Cabrera also points to Palés's comments—made to a group at

15 a general meeting—that the company needed "younger blood" and thrived because of its

16 young employees; she testified that she heard him make similar remarks on two or three

17 occasions. (Docket Nos. 54 at 8; 54-22.) Although she admitted that his remarks were not

18 addressed directly to her, on one occasion within a group conversation, Palés remarked to her

19 that their competitors floundered because they hired old people and retired people. (Docket

1   Nos. 54 at 8; 54-22 at 5–6.)  She did not complain about his comments because she did not

2   want to be misunderstood or get a bad reputation at the company.  (Docket No. 54-22.)

3          In June or July of 2008, she met with Palés and explained some of her problems with

4   Báez and her team.  Palés told her that "things would change," and he told her she would be

5   promoted to Regional Director of Arecibo in August 2008; he also told her that he liked

6   young people, and that people like Samir Durán ("Durán") and Yanice Román ("Román")

7   would end up in high positions in the company.  (Docket No. 54 at 9; 68-1 at 9.)

8          She was promoted at the age of forty and assumed her new post in August of 2008.

9   (Docket No. 54 at 9; 68-9 at 10.)  Rocket Learning offered her a commission package at a

10  higher percentage rate than normally given for the position, because the region's area had

11  been reduced and without the higher rate she would have made less than other Regional

12  Directors.[20]  (Docket No. 54 at 9; 54-25; 68-9 at 10.)  She was relieved of certain duties and

13  responsibilities after her promotion; specifically, she was instructed not to serve one specific

14  school called "Rafael Samot," and was told after her promotion by Palés that she did not have

15  the authority to hire additional personnel for the region, even if she had contracted personnel

16  before her promotion.[21]  (Docket No. 54 at 9; 54-26; 68-1 at 10.)  After the promotion, in the

_____

[20] She testified that the Arecibo region was reduced by half, half was given to Báez, and that because of the "reduction in her territory Plaintiff had to work more . . . to obtain the same salary she had in previous years."  (Docket No. 68-1 at 27.)  She negotiated a preferential commission rate and compensation package.  (Id. at 28.)  She also testified that Palés verbally agreed to pay her monthly for the use of her personal office, in addition to water and electricity, but that the amount was never paid.  (Id.)

[21] She testified that her responsibilities and duties were the same as other Regional Directors, but that she did not have the same tools to fulfill them.  (Docket Nos. 54-27; 68-8 at 300.)  She also said that the stressors and duties imposed on her were generally the same for all Regional Directors.  (Docket Nos. 54 at

1    Fall of 2008, B. Pérez referred to Ms. Cabrera at a Regional Directors' meeting as a sea

2    urchin ("erizo") and pondered aloud as to "how she could caress a sea urchin."  (Docket

3    No. 54 at 10.)  Ms. Cabrera also testified that B. Pérez gave her certain instructions over the

4    phone, followed by contradictory instructions sent via email, in order to make her fail.[22]  (Id.)

5           In November 2008, two Program Managers, Durán and Ivis Martínez ("Martínez"),

6    transferred from the Bayamón region to Arecibo.  Ms. Cabrera testified that the pair reported

7    situations out of context to B. Pérez, and "whenever [Ms.] Cabrera attempted to tell B. Pérez

8    or Palés her side of the story, they simply unauthorized her and gave [Durán or Martínez] the

9    authority."[23]  (Id.)  She had no problems with any of her other Program Managers.  (Id.)  She

10   also testified that B. Pérez held meetings with Durán without notifying her.  (Docket Nos. 54

11   at 16; 65-75.)

12          Also in November of 2008, she requested a meeting with B. Pérez and Palés, who

13   attended along with Durán and another Arecibo Program Manager, Darlene Colón.  (Docket

14   Nos. 54 at 16; 68-1 at 18.)  Ms. Cabrera requested this meeting "to discuss and rebut several

15   comments" made to higher management by Durán.  She testified that during this meeting, B.

_____

10; 54-29.)

[22] B. Pérez, formerly a Regional Director before her promotion, is older than Ms. Cabrera.  (Docket No. 54 at 2.)

[23] We reject Ms. Cabrera's statement that B. Pérez furtively instructed the pair "to create issues against the Plaintiff, creating a hostile work environment and to force [her] resignation," (Docket No. 68-1 at 31), as completely lacking a factual basis.  Plaintiff must do more than merely cite to her own speculative and conclusive testimony to establish such a fact.  See Torrech-Hernandez v. GE, 519 F.3d 41, 48 (1st Cir. 2008) (noting courts are not "obliged to accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement made to the Court by a party").

1    Pérez and/or Palés told Ms. Cabrera that her coworkers didn't want her, her work team was

2    composed of younger people, she did not understand them, and they needed a younger person

3    as a leader.  (Docket No. 54 at 16.)  She also testified that they told her she had an ego

4    problem, "which at her age, being a mature person, was wrong." (Id.)  Finally, Palés referred

5    to her as "vieja" ("old woman") and told her to behave herself.  (Id.)  "After that meeting

6    they reached certain agreements and [some of] the situations were solved."  (Id. (citing

7    Docket No. 54-47).)

8          Later that month, she met with H. Pérez, who told her that he had received complains

9    from B. Pérez amounting to just cause for dismissal, including her tardy arrival "to certain

10   litigation she was required to attend on behalf of" the company.  (Docket Nos. 54 at 11; 68-1

11   at 12.)  She testified that he told her that: "[S]he was not going to retire" from Rocket

12   Learning, "she had to consider if at her age she could continue" in her position, he had "seven

13   young and successful people waiting for her position," and she would receive the best of

14   references if she were to leave the company at that point in time.  (Docket No. 54 at 11.)  She

15   testified that she told him she felt capable of continuing, but she was being harassed and

16   discriminated against.  (Docket No. 68-1 at 38.)  No one else was present at that meeting,

17   which came less than three months after her promotion.[24]  (Id.)  Ms. Cabrera was never

18   demoted during her tenure at Rocket Learning, and her income increased yearly.  (Id. at 17.)

_____

[24] Unlike several of her statements of fact, her allegation that B. Pérez ordered younger employees to draft reports against her offers several proper record citations.  Unfortunately, none of them actually support her statement and, thus, we reject it.  (Docket No. 68-1 at 30.)

1    Her superiors were satisfied with her performance in terms of student enrollment, but were

2    less than thrilled with her interpersonal relationships or leadership skills.  (Docket No. 82 at

3    23.)

4          Soon after that meeting, Ms. Cabrera reported to the SIF on November 12, 2008.

5    (Docket Nos. 54 at 12; 40 at 2.)  Ms. Cabrera informed Rocket Learning's Controller that she

6    had reported to the SIF for stress and spasms; making no mention of discrimination or

7    harassment.[25]  (Docket No. 54 at 12.)  Ms. Cabrera testified that Rocket Learning took almost

8    a month to sign the SIF documents she submitted.[26]  (Id. at 13.)

9          At the SIF,[27] Ms. Cabrera was diagnosed with cervical lumbar myositis and was

10    submitted for an initial psychological evaluation,[28] in which she exhibited symptoms of

---

[25] Ms. Cabrera states, in a perfunctory manner, that she reported to the SIF in November because of the stress from work, but at the SIF she was treated for her back problems.  Unlike her brother's treatment notes, in the notes from her psychological initial evaluation—as well as subsequent follow-up appointment notes—no mention is made of her job. In fact, she was released from SIF treatment after a determination that her mental health condition was unrelated to her employment.  See Torrech-Hernandez v. GE, 519 F.3d at 47.

[26] At her deposition, when asked if she thought the delay was related to her age, Ms. Cabrera answered in the affirmative.  Likewise, when asked if Rocket Learning would have signed them [faster] if she had been twenty-seven instead of forty, she said yes.  (Docket No. 54-38.)  She provided no further factual support or elaboration for her responses.

[27] Unfortunately, in this portion of their statement of facts, Defendants fail to give proper record citations, referring only to the forty-nine page "Docket 40," in violation of the Local Rules discussed above.  As such, we need not accept all their offending statements of material facts.  In response to Plaintiffs' concern over the "typewritten transcript" of the medical documents, we note that we do not rely upon said transcription.  And, while we have examined the original handwritten documents, we rely upon the English versions of certified translations of the SIF documents at Docket No. 65-67.

[28] This document lacks a date.  It could have occurred during her next visit to the SIF in early 2009, discussed below.  The notes describe her as looking younger than her chronological age and described her mood as anxious, distressed, anhedonic, with sleep difficulties, palpitations, and sweating. (Docket Nos. 54 at 13; 68-1 at 15.)

1    depression and anxiety.  (Docket Nos. 40; 54 at 13; 65-67.)  The evaluation notes contain no

2    mention of discrimination, harassment, or a relationship between her symptoms and her job.

3    (Docket No. 65-67.)  The evaluating doctor recommended rest and partial hospitalization,

4    but she was told that she could continue to work.[29]  (Docket Nos. 68-1 at 15; 40 at 8; 65-67

5    at 12.)  She worked while receiving treatment.  (Docket No. 68-1 at 35.)

6           In early January of 2009, Ms. Cabrera testified, José Vargas and Brenda Pérez gave

7    a seminar to Durán and Martínez at a meeting without notifying her.  (Docket No. 65-75 at

8    1–2.)  Also on January 23, Ms. Cabrera reported to the SIF again because of a strain in her

9    knee and hand; she was ordered to rest for several days.  (Docket No. 68-1 at 35.)  She

10   prepared a contingency plan, unilaterally appointing Norma González as her substitute, but

11   she was reprimanded for making this plan without seeking the prior approval of her

12   supervisors.  (Id.)

13          On January 28, 2009, Palés wrote Ms. Cabrera an email reprimanding her for: Her

14   failure to call and coordinate her absence with her supervisor, continuing to work in

15   contravention of the SIF's rest orders, attempting to discredit other employees, and

16   disobeying instructions from her supervisors.  (Docket No. 82-10.)  After four days of

17   absence, the SIF authorized her to return to work.  (Id. at 15; see also Docket No. 68-13.)

18   Ms. Cabrera testified that shortly after sending the email, Palés called her and called her

---

[29] In a later follow-up appointment, the psychiatrist recommended that she rest while receiving treatment.  (Docket Nos. 54 at 13; 68-1 at 15.)

1    "vieja" ("old woman") on the phone,[30] then again told her that she should behave herself, that

2    she had been disparaging Durán, that he would not tolerate it any longer, and that she was

3    an embarrassment to the company.  (Docket No. 68-1 at 36.)

4            In an email of February 1, 2009, Palés requested the SIF documents authorizing a

5    return to work, and noted that the lack of coordination with her supervisors during her

6    previous departure caused confusion.  (Docket No. 65-69.)  Palés wanted to meet with her

7    in person to coordinate her reintegration into work, but was out of Puerto Rico at the time;

8    thus, he requested her to remain resting until February 9, 2009.  (Docket No. 54 at 15.)

9    When she asked to be paid for the days she would miss, he agreed and paid her for those

10   days. (Docket Nos. 54 at 15; 68-1 at 18.)  She never returned to work after this.[31]   (Docket

11   Nos. 54 at 15; 68-1 at 18.)   At midnight on February 2, 2009, she emailed H. Pérez

12   requesting an urgent meeting, and then forty-five minutes later emailed two members of the

13   Rocket Learning Board of Directors about her and Mr. Cabrera's problems at the company.[32]

14   (Docket No. 82-10 at 2.)

---

[30] Specifically, she testified that he told her "to behave, that [she] was already an old woman to be behaving in that way."  (Docket No. 78-6 at 5.)

[31] The parties disagree as to whether January 23 or January 30 was her last day reporting to work. (Docket No. 54-60.)

[32] Palés sent her a brief email of reprimand on February 5, 2009, reminding her of the chain of command in the company and notes an ongoing pattern of conduct that they could not tolerate from someone in a high-ranking position like hers.  (Docket No. 82-9.)  Ms. Cabrera testified that receiving this email triggered an emotional crisis requiring partial hospitalization.  (Docket No. 68-10 at 364.)

1    Ms. Cabrera resigned on May 6, 2009—the same day as her brother.[33] (Docket No. 54

2    at 17.)  No mention of discrimination was made in their joint resignation email.  (Id.)  She

3    continued receiving psychiatric treatment at the SIF, where she was diagnosed with major

4    depression.  (Docket No. 65-67 at 3–4.)  She was discharged from treatment at the SIF, after

5    the psychiatric board determined the depression was unrelated to her employment on

6    November 15, 2010.[34]  (Docket No. 65-67 at 3–4.)  During her deposition, she testified that

7    she later understood age discrimination to be the cause of all her work problems, even though

8    "[a]t that moment, precisely, [she] did not discern it that way . . . ." (Docket No. 68-87 at 1.)

9    Durán was subsequently appointed Regional Director of Arecibo in July of 2009 at the age

10   of 27.  (Docket No. 68-20.)

11       For the 2008–2009 term, prior to Plaintiffs' resignation, four out of the seven

12   Regional Directors were over the age of forty.  (Docket Nos. 51-5; 54 at 12.)  Some time

13   between their resignation in May and August 6, 2009, Plaintiffs sent a letter to Rocket

14   Learning through an attorney alleging the underpayment of commissions and requesting the

15   payment of money allegedly owed.  (Docket Nos. 51 at 11; 65-33.)  The letter of claims made

---

[33] Ms. Cabrera (with an improper record citation) directs us to her brother's answer to interrogatories to support her statement that she received an email implicating B. Pérez in a complot against the siblings; Ms. Cabrera, in her deposition of over 380 pages, did not testify as to receipt of this email.  (Docket No. 68-1 at 37.)  Nor did she provide a copy of the email.  Because of her failure to provide proper record citations or factual support, we do not accept this statement of fact for summary judgment purposes.  We likewise reject her unsupported statement that Defendants began a defamation campaign against her in the Spring of 2009.  (Id.)

[34] Specifically, they noted that it was "understood that a situation capable of producing the alleged emotional picture has not occurred.  Therefore, the emotional condition is not related to the job."  (Docket No. 65-67 at 3.)

1    no mention of age discrimination; Mr. Cabrera testified that this was because this attorney

2    told him he had to see an employment law specialist.  On August 6, 2009, both Plaintiffs

3    filed charges of discrimination with the EEOC, alleging age discrimination. (Docket Nos. 54

4    at 16; 65-30.)  On September 8, 2010, they filed the present suit.  (Docket No. 1.)

5                                                    **II.**

6                          **Summary Judgment Under Rule 56**

7              We must grant a motion for summary judgment "if the pleadings, the discovery and

8    disclosure materials on file, and any affidavits show that there is no genuine dispute as to any

9    material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

10   P. 56(a).  A factual dispute is "genuine" if it could be resolved in favor of either party and

11   "material" if it potentially affects the outcome of the case.  Calero-Cerezo v. U.S. Dep't of

12   Justice, 355 F.3d 6, 19 (1st Cir. 2004).

13            The movant carries the burden of establishing that there is no genuine dispute as to

14   any material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The movant may

15   satisfy this burden by "citing to particular parts of materials in the record, including

16   depositions, documents, electronically stored information, affidavits or declarations, . . . or

17   other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Furthermore, to establish the absence of a

18   genuine dispute of material fact, the movant need not produce evidence but may instead point

19   to a lack of evidence supporting the nonmovant's case.  See Fed. R. Civ. P. 56(c)(1)(B); see

20   also Celotex, 477 U.S. at 325.  "Once the moving party has made a preliminary showing that

Civil No. 10-1865 (JAF)                                                    -22-

1    no genuine [dispute] of material fact exists, the nonmovant must produce specific facts, in

2    suitable evidentiary form, to establish the presence of a trialworthy [dispute]." Clifford v.

3    Barnhart, 449 F.3d 276, 280 (1st Cir. 2006) (internal quotation marks omitted); see also Fed.

4    R. Civ. P. 56(c)(1).

5           In evaluating a motion for summary judgment, we must view the record in the light

6    most favorable to the nonmovant. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133,

7    150–51 (2000). "Although we draw all reasonable inferences in the nonmovant's favor, . .

8    . . [a] properly supported summary judgment motion cannot be defeated by conclusory

9    allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."

10   Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) (citations omitted) (internal

11   quotation marks omitted). "The court need consider only the cited materials, but it may

12   consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

13                                           **III.**

14                                        **Analysis**

15          Plaintiffs allege that Defendants violated the ADEA and Commonwealth laws with

16   the actions described above in Part I. Specifically, both allege that they each suffered a

17   hostile work environment and a constructive discharge in violation of the ADEA, Law 100,

18   Law 115, Law 45, PRWACA, and Law 80.

1        Defendants argue that they are entitled to summary judgment on each of these claims.

2    (Docket Nos. 53; 56.)   We agree, and for the reasons discussed below, we dismiss the

3    Complaint in its entirety.

4    **A.        ADEA**

5        Plaintiffs allege that codefendant Rocket Learning caused their constructive discharge

6    and created a hostile work environment in violation of the ADEA.  We discuss each claim

7    in turn below.[35]

8        **1.        ADEA: Constructive Discharge**

9        The ADEA prohibits an employer from taking an adverse employment action against

10   an employee who is forty years of age or older because of the latter's age.[36]  Bennett v.

11   Saint-Gobain Corp., 507 F.3d 23, 30 (1st Cir. 2007) (citing 29 U.S.C. §§ 623(a)(1), 631(a)).

12   "Just as the ADEA bars an employer from dismissing an employee because of his age, so too

13   it bars an employer from engaging in a calculated, age-inspired effort to force an employee

14   to quit.  Accordingly, a constructive discharge can ground an employment discrimination

15   claim" under the ADEA.  Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000) (citing

16   Ramos v. Davis & Geck, Inc., 167 F.3d 727, 731–33 (1st Cir. 1999).  Ultimately, ADEA

17   "plaintiffs must establish that age was the but-for cause of the employer's adverse action."

---

[35] We note at the start that Plaintiffs cannot recover punitive or compensatory damages for pain and suffering under the ADEA.  Collazo v. Nicholson, 535 F.3d 41, 45 (1st Cir. 2008).  The remedy provisions of ADEA focus solely on "those pecuniary benefits connected to the job relation, including unpaid wages or overtime compensation."  Id. at 44–45 (internal quotations and citations omitted).

[36] We have already dismissed Plaintiffs' ADEA claims against the individual defendants in their individual capacity.  (See Docket No. 31.)

1   Velez v. Thermo King de P.R., Inc., 585 F.3d 441, 446 (1st Cir. 2009) (citing Gross v. FBL

2   Fin. Servs., Inc., 557 U.S. 167 (2009)).  "Where, as here, the employee lacks direct evidence,

3   we utilize the burden-shifting framework developed by the Supreme Court to facilitate the

4   process of proving discrimination" in McDonnell Douglas Corp. v. Green, 411 U.S. 792

5   (1973).  Bonefont-Igaravidez v. Int'l Shipping Corp., 659 F.3d 120, 123 (1st Cir. 2011).

6          Utilizing the McDonnell framework to establish a prima-facie case of employment

7   discrimination under the ADEA, a plaintiff must establish "(1) she was at least forty years

8   of age; (2) her job performance met the employer's legitimate expectations; (3) the employer

9   subjected her to an adverse employment action (e.g., an actual or constructive discharge); and

10  (4) the employer had a continuing need for [the plaintiff's services]." De la Vega v. San Juan

11  Star, Inc., 377 F.3d 111, 117 (1st Cir. 2004) (citing Gonzalez v. El Dia, Inc., 304 F.3d 63, 68

12  n.5 (1st Cir. 2002)).

13         Once the plaintiff has established this prima-facie case—the First Circuit has

14  described "this prima facie showing as 'modest,' . . . and a 'low standard'"—then the burden

15  of production shifts to the employer to come forward with a legitimate, nondiscriminatory

16  reason for its decision.  Velez, 585 F.3d at 447 (citations omitted).  If the employer meets this

17  burden, then "the focus shifts back to the plaintiff, who must then show, by a preponderance

18  of the evidence, that the employer's articulated reason for the adverse employment action is

19  pretextual and that the true reason for the adverse action is discriminatory." Lockridge v.

20  Univ. of Me. Sys., 597 F.3d 464, 470 (1st Cir. 2010) (citing Smith v. Stratus Computer, 40

1    F.3d 11, 16 (1st Cir. 1994)).  Where "a plaintiff in an employment discrimination case alleges

2    that the adverse employment action which he suffered was an unpleasant working

3    environment that resulted in his discharge, it 'presents a special wrinkle that amounts to an

4    additional prima facie element.'"   Gutierrez-Lines v. P.R. Elec. & Power Auth., 751

5    F.Supp.2d 327, 339 (D.P.R. 2010) (quoting Landrau-Romero v. Banco Popular de P.R., 212

6    F.3d 607, 612 (1st Cir. 2000)).

7            "To take the measure of a claim of constructive discharge, an inquiring court must

8    gauge whether the working conditions imposed by the employer had become so onerous,

9    abusive, or unpleasant that a reasonable person in the employee's position would have felt

10   compelled to resign." Suarez, 229 F.3d at 54 (citing Vega v. Kodak Caribbean, Ltd., 3 F.3d

11   476, 480 (1st Cir. 1993)).  But the subjective beliefs of an employee do not determine the

12   outcome; this test is one of objective reasonableness.  Id. (citing Serrano-Cruz v. DFI P.R.,

13   Inc., 109 F.3d 23, 26 (1st Cir. 1997)).    The First Circuit has reminded plaintiffs that "the

14   workplace is not a cocoon, and those who labor in it are expected to have reasonably thick

15   skins." Id.  To succeed, "an employee 'must show that, at the time of his resignation, his

16   employer did not allow him the opportunity to make a free choice regarding his employment

17   relationship.'  Thus, in order for a resignation to constitute a constructive discharge, it

18   effectively must be void of choice or free will." Torrech-Hernandez v. GE, 519 F.3d 41, 50

19   (1st Cir. 2008) (citations omitted).

20

Civil No. 10-1865 (JAF)                                                    -26-

1        **i.      Ferdinand Cabrera**

2        In regard to Mr. Cabrera's prima-facie case, the first and the fourth prongs are not in

3    dispute.  Nor is the second: He "functioned adequately as [a Regional Director] for several

4    years, and the defendants, though critical of certain aspects of his performance, do not claim

5    for summary judgment purposes that he lacked the necessary skills to do his job.  Thus, the

6    focus here is on the third of the four prongs."  Suarez, 229 F.3d at 54.  On summary

7    judgment, Defendants do not contest the remarks and discriminatory actions he alleges;

8    instead, they argue that, taken at face value, these allegations do not rise to the level of a

9    constructive discharge.  (Docket No. 53 at 7.)  We agree.

10       The purported adverse employment actions and remarks alleged by Mr. Cabrera do

11   not add up to a constructive discharge claim.  He may have felt inconvenienced at having to

12   report to the Hato Rey office during the four months that he acted as Regional Director for

13   Bayamón, but he knew he would have to commute there when he accepted the position and

14   his traveling expenses were increased.[37]  Moreover, Rocket Learning requested that all

15   Regional Directors report to their offices daily to manage their team; the requirement was

16   "administered even-handedly."  See Suarez, 229 F.3d 49, 55 (1st Cir. 2000).  His ill-

17   supported statements regarding the higher quotas he had to meet in Bayamón and his increase

---

[37] The parties disagree as to whether he was promised a new separate office in Bayamón but, even if they made such an agreement, the office would not have opened overnight—he would still have to commute for some time.  His team reported to Hato Rey, the previous Regional Director for Bayamón had reported there, and he was no stranger to commuting—as he had done previously for his positions in Ponce and Caguas.

1   in work hours do not show that his working conditions became so onerous that a reasonable

2   person would resign.  See id. ("An increase in work requirements that does not surpass

3   reasonable expectations will not suffice to sustain a claim of constructive discharge." (citing

4   Greenberg v. Union Camp Corp., 48 F.3d 22, 27–28 (1st Cir. 1995))).

5        Mr. Cabrera also highlights Palés's reprimands and warnings about the Bayamón

6   team, but "none of the reprimands here can be said to be material because none carried with

7   it any tangible consequences. Rather, each was merely directed at correcting some workplace

8   behavior that management perceived as needing correction . . .," such as sending

9   congratulatory emails to his old team in Ponce, when he had a strained relationship with his

10   new team in Bayamón.  Bhatti v. Trs. of Boston Univ., 659 F.3d 64, 73 (1st Cir. 2011).

11   Mr. Cabrera's position at the company did not change, and Palés explicitly stated that he was

12   giving him more time to fix his leadership problems.  His further allegations (of petty

13   disputes between his colleagues over promotional materials, that his supervisor B. Pérez

14   communicated with his team—which she led before her promotion—without him and

15   micromanaged him, and that his Bayamón team would not look him in the eye) also fall flat.

16   "Courts may not sit as super personnel departments, assessing the merits" of employers'

17   nondiscriminatory business decisions.  Mesnick v. GE, 950 F.2d 816, 825 (1st Cir. 1991).

18        Furthermore, even assuming arguendo that Mr. Cabrera has successfully presented a

19   prima-facie case, the claim still fails.[38]  The six instances of ageist remarks in the record do

---

[38] We note, but need not reach, Defendants' arguments based on the "same actor" defense, as the same actors who hired Plaintiffs are now accused of forcing their resignation.  See Ortiz-Rivera v. Astra

1    not rise to the level of constructive discharge.[39]  The First Circuit has held repeatedly that

2    stray remarks "as well as statements made either by non-decisionmakers or by

3    decisionmakers not involved in the decisional process, normally are insufficient, standing

4    alone, to establish either pretext or the requisite discriminatory animus."  Melendez v.

5    Autogermana, Inc., 622 F.3d 46, 54 (1st Cir.2010) (citing Gonzalez, 304 F.3d at 69).

6         While evidence of age-related comments may be sufficient to support an inference of

7    pretext and discriminatory animus, Mr. Cabrera "has failed to adduce sufficient evidence for

8    a reasonable trier of fact to conclude that the remarks were both temporally and causally

9    connected" to the resignation.  Id. (citations omitted).  The most recent discriminatory

10   remarks at his meeting with Palés in November 2008 came nearly six months before

11   Mr. Cabrera tendered his resignation in May 2009, and he testified that he experienced no

12   further acts of discrimination after January 15, 2009.  See McMillan v. Mass. SPCA, 140

13   F.3d 288, 301 (1st Cir. 1998) (noting that remarks' "probativeness is circumscribed if they

14   were made in a situation temporally remote from the date of the employment decision").

15   Furthermore, the last "discriminatory" act on January 15, 2009, was when he was told he had

16   used up all his remaining sick days because of his absences.  Without more, such  a

Zeneca LP, 596 F. Supp. 2d 231, 248 (D.P.R. 2009) (noting "same actor fact must be considered in
conjunction with all of the other evidence presented at summary judgment" but merits no automatic
presumptions).

    [39]  As for his supervisor's comments that Rocket Learning needed a "young leader" and "young
blood," we find such ambiguous comments do not necessarily imply age discrimination.  "Words of praise
for youth . . . do not, by themselves, indicate a bias against more mature workers.  Mesnick, 950 F.2d at 826.

1    communication does not demonstrate age discrimination, and it certainly does not

2    demonstrate a constructive discharge.

3           Even if the remarks had not been too remote, Mr. Cabrera did not subjectively feel

4    compelled to resign; he testified that after his November meeting with Palés, he still felt that

5    he could continue to work and had other options apart from resignation.  (Docket Nos. 51 at

6    7–8.)  He testified further that even in January, after sending his lengthy seventeen-page

7    screed,[40] he felt that he still had the option to return to his position.  (Docket No. 65-28 at

8    16.)

9           Moreover, Defendants have presented a legitimate nondiscriminatory reason for his

10   transfer and for the .1% decrease in his commission.  As discussed above in Part I, he was

11   transferred to Ponce after complaints of pregnancy discrimination from his team in Arecibo.[41]

12   Moreover, before he was temporarily moved to Caguas, he had emailed his superiors

13   volunteering his help for any additional tasks.  He asked for a transfer, and was given the

14   Bayamón region (although it was not his first choice), where his new team complained about

15   his leadership.  As for the .1% decrease in his commission (a discretionary bonus) to .5% for

16   2007-2008, four out of six Regional Directors also received .5% in the first cycle, and in the

17   second cycle all of the Regional Directors made .5% commissions—failure to give him

---

[40] We note that although Mr. Cabrera's letter listed legion injustices and wrongs he claimed to suffer at the Defendants' hands, including familial or social discrimination, it contained no reference to age discrimination.

[41] Mr. Cabrera himself stated that his age played no part in the 2007 decisions.

1    special treatment or a higher discretionary bonus (in a year in which his team accused him

2    of pregnancy discrimination) does not reek of pretext.  And Plaintiffs have done nothing to

3    show pretext.  Mr. Cabrera's conclusory allegations of a conspiracy to discredit him because

4    of his age fall flat without factual support.

5           Mr. Cabrera has failed to show that his "employer engaged 'in a calculated,

6    age-inspired effort to force [him] to quit.'"  Gutierrez-Lines, 751 F. Supp. at 339 (quoting

7    De la Vega, 377 F.3d at 117).  More importantly, he has failed to show that his working

8    conditions were so "onerous, abusive, or unpleasant that a reasonable person in the

9    employee's position would have felt compelled to resign," and so we dismiss this claim.  Id.

10          **ii.    Janet Cabrera**

11          As above, for summary judgment purposes, only the third prong of the constructive

12   discharge test is in dispute.  We find that Ms. Cabrera, like her brother, has failed to show

13   that her working conditions were severe enough to rise to the level of a constructive

14   discharge.  As discussed in Part I, her salary was never reduced, and she enjoyed one of the

15   highest commission rates in the company.  Her complaints about losing one school and the

16   ability to unilaterally hire additional personnel do not suffice.  The First Circuit has stated

17   that "a reduction in responsibility or a change in the way that business is done,

18   unaccompanied by diminution of salary or some other marked lessening of the quality of

19   working conditions, does not constitute a constructive discharge."  Suarez, 229 F.3d at 55.

20   Moreover, her vague complaint that the reduction of schools in the Arecibo region resulted

1  in more work for her (which was presumably why she negotiated for a higher commission

2  rate) does not rise to the level of a constructive discharge.  Id.

3        Furthermore, the majority of the conduct and comments in the record were too remote

4  from the date of her resignation in May of 2009 to constitute a constructive discharge.[42]

5  Landrau-Romero, 212 F.3d at 613 (holding seven months between conduct and resignation

6  was too remote); Serrano-Nova v. Banco Popular de P.R., 254 F. Supp. 2d 251, 265 (D.P.R.

7  2003) (holding six months too remote). The comments in November of 2008 came at least

8  six months before her resignation.

9        As for Palés's comment in January, we find it was not probative of a constructive

10  discharge.  First, the comment did not unambiguously communicate an aged-based animus;

11  in fact, his remark is quite susceptible to a nondiscriminatory interpretation.  Gonzalez, 304

12  F.3d at 70.  Specifically, she testified that he told her "to behave, that [she] was already an

13  old woman to be behaving in that way."[43]  (Docket No. 78-6 at 5.)  Given the interpersonal

14  difficulties she had with management and her team, as well as her escalating rivalry with a

15  younger subordinate,[44]  Palés could have been admonishing her by telling her she needed to

16  act like an adult.  Second, even if we interpreted "vieja" in that context to mean old, stray

17  remarks alone are insufficient to pretext or the requisite discriminatory animus.  Melendez,

---

[42] Or the comments occurred before she reached the age of forty.

[43] Her original testimony in Spanish read "y nuevamente me volvió a repetir que me comportara, que yo era una vieja ya para comportarme de esa forma."  (Docket No. 68-9.)

[44] (See Docket No. 82-2 (email from Ms. Cabrera of January 21, 2009, to Durán admonishing Durán for not respecting her authority and including B. Pérez and Palés on the email recipient list).)

1   622 F.3d at 54–55.  She has failed to show a causal connection between the conduct and

2   remark and her resignation (which occurred three months apart); she did not even return to

3   work after her second SIF visit.  She has not provided the allegedly incriminating email

4   revealing the alleged complot of B. Pérez—and does not even offer deposition testimony

5   about it—and none of the notes from her SIF treatments make mention of discrimination at

6   work.  On the contrary, the SIF found that her condition of depression was unrelated to any

7   workplace situation.  In short, we find "insufficient evidence to draw the inference that

8   impermissible age discrimination was the determinative factor" in her resignation.  Id. at 55.

9          **2.      Hostile Work Environment**

10         Hostile work environment claims originated in sex discrimination litigation, "but have

11   since been recognized for members of any protected class."  Rivera-Rodriguez v. Frito Lay

12   Snacks Caribbean, 265 F.3d 15, 24 (1st Cir. 2001) (citing Lattimore v. Polaroid Corp., 99

13   F.3d 456, 463 (1st Cir. 1996)) (discussing origin of hostile work environment claims under

14   ADEA).  Under the ADEA, a hostile work environment plaintiff "must provide sufficient

15   evidence from which a reasonable jury could conclude that the offensive conduct is severe

16   and pervasive enough to create an objectively hostile or abusive work environment and is

17   subjectively perceived by the victim as abusive."  Id. (internal quotations and citations

18   omitted).

19         Specifically, a plaintiff must show: (1) he is a member of a protected class; (2) he was

20   subjected to unwelcome harassment; (3) the harassment was based on age; (4) such

1    harassment was sufficiently pervasive or severe so as to alter the conditions of his

2    employment and create an abusive work environment; "(5) the objectionable conduct was

3    both objectively and subjectively offensive such that a reasonable person would find it hostile

4    or abusive and that the plaintiff did in fact perceive it to be so; and (6) some basis for

5    employer liability has been established." Mojica v. El Conquistador Resort & Golden Door

6    Spa, 714 F. Supp. 2d 241, 260 (D.P.R. 2010) (citing O'Rourke v. City of Providence, 235

7    F.3d 713, 728 (1st Cir. 2001).

8         A court looks to the totality of "the circumstances, including the frequency and

9    severity of the discriminatory conduct, whether it was physically threatening or humiliating,

10   and whether it unreasonably interfered with [a plaintiff's] work performance." Kosereis v.

11   Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003) (internal quotation marks and citations

12   omitted); see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 22–23 (1993) (noting that there

13   is no "mathematically precise test" and while relevant factors "may be taken into account,

14   no single factor is required" to find a hostile environment).  However, a claim for hostile

15   work environment does not "arise from 'simple teasing, offhand comments, and isolated

16   incidents.'" Kosereis, 331 F.3d at 216 (quoting Faragher v. City of Boca Raton, 524 U.S.

17   775, 788 (1998)).

18        **i.    Ferdinand Cabrera**

19        Mr. Cabrera has failed to show that the harassment he faced was so pervasive or

20   severe so as to alter the conditions of his employment and create an abusive work

1    environment.[45]  Mojica, 714 F. Supp. 2d at 260.  Mr. Cabrera testified that he found the

2    remarks offensive, but has not alleged that they interfered with his work.  The remarks were

3    far from physically threatening and made in private meetings.  Albeit inappropriate for Palés

4    to call him a paranoid old man during their meeting, nothing indicates that his remarks during

5    the verbal reprimand altered Mr. Cabrera's work conditions.  "[M]ere offensive utterances

6    that did not unreasonably interfere with the employee's work performance do not amount to

7    harassment that in essence altered the terms or conditions of [a plaintiff's] employment."

8    Fontanez-Nunez v. Janssen Ortho LLC, 447 F.3d 50, 57 (1st Cir. 2006) ("[A] supervisor's

9    unprofessional managerial approach . . . [is] not the focus of the discrimination laws.")

10   (quoting Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34, 46–47 (1st Cir.

11   2003))).   After mapping the constellation of facts in this case, we cannot find that the

12   workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently

13   severe or pervasive enough to alter the conditions of employment and create an abusive

14   working environment.  AMTRAK v. Morgan, 536 U.S. 101, 116 (2002) (citations and

15   internal quotation marks omitted).

16

---

[45] We note that he has likely failed to meet the fifth prong of the test, which requires a plaintiff to show that the conduct and remarks were so "objectively and subjectively offensive such that a reasonable person would find it hostile or abusive and that [he] did in fact perceive it to be so." Mojica, 714 F.Supp.2d 241, 260 (D.P.R. 2010) (emphasis added).  As discussed in Part I.A., Mr. Cabrera's seventeen-page letter of January 2009 listed legion injustices and wrongs he claimed to suffer at the Defendants' hands, familial or social discrimination, but contained no reference to age discrimination or the remarks herein alleged.  Nor did he mention age discrimination or the remarks in the letter from an attorney claiming unpaid commissions, and the SIF psychologist's notes contain no mention of discrimination, even though Mr. Cabrera discussed his job during his psychological evaluation.

1        **ii.    Janet Cabrera**

2        Ms. Cabrera's hostile working environment claim also fails.  Analyzing the evidence

3   as a whole, we cannot find that the harassment she experienced was so severe and pervasive

4   as to create an objectively hostile or abusive work environment or that she subjectively

5   perceived it to be abusive.[46]

6        She testified as to three incidents in closed meetings where her supervisors made

7   comments regarding her age.  The "complained of conduct was episodic, but not so frequent

8   as to become pervasive; was never severe; was never physically threatening (though

9   occasionally discomforting or mildly humiliating); and significantly, was never, according

10  to the record, an impediment to[her] work performance."  Lee-Crespo, 354 F.3d at 46.

11       As discussed in Part I.B., the November comments by Palés and B. Pérez came in the

12  context of a meeting that Ms. Cabrera requested to "rebut" complaints from her subordinates.

13  Given the repeated petty skirmishes with her subordinates and supervisor, their comment that

14  she had an ego problem, "which at her age, being a mature person, was wrong" could have

15  been interpreted as admonishment for perceived problems in her interpersonal and leadership

16  skills.  She also testified that B. Pérez told her she did not understand her team, which was

---

[46] However, we disregard Defendants' absurd argument that she was too attractive to experience age discrimination.  Defendants argue that as "far as whether J. Cabrera looks like the type of person prone to age discrimination, it is worth mentioning that she is a former model and modeling teacher, who had experience with photo shootings, catwalks and appearing in films, who claimed to be up-to-date with the latest fashion trends . . . ," and refer us to the photographs of her that they have submitted as exhibits.  (See Docket No. 56.)  Defendants offer no comments on her brother's appearance in their twin motion for summary judgment against him.  Unfortunately, Defendants offer no legal basis to support their novel (yet somewhat sexist) argumentation strategy.  We know of no statutory exception rendering age discrimination against attractive, fashionable women legally impossible.

1   made up of young people who did not want her, and that they needed a young leader.[47]  But

2   she did not testify that this meeting or the comments interfered with her job or her workplace

3   performance[48] but, instead, they reached certain agreements and resolved some of the issues.

4   Despite the less-than-tactful nature of the comments, a "supervisor's unprofessional

5   managerial approach and accompanying efforts to assert her authority are not the focus of

6   the discrimination laws." Lee-Crespo, 354 F.3d at 46–47.

7            In November of 2008, H. Pérez told her that she should consider if at her age she

8   could continue leading the region, that he had "seven young and successful people waiting

9   for her position," and she would receive the best of references if she were to leave the

10  company at that point in time.  (Docket No. 54 at 11.)  He made these comments in a private

11  disciplinary meeting, held to discuss her repeated tardiness to litigation she attended on

12  behalf of the company and complaints about her made to B. Pérez.  (Id.)  His comments are

13  perhaps unkind, but do not unambiguously reflect a discriminatory animus.  Given her recent

14  behavior and petty conflicts with her subordinates and her supervisor, his comments could

15  reasonably be interpreted as an impolite reprimand and warning (informing her that he had

16  other people with better attitudes willing to do her job).  His isolated remark will not suffice.

---

[47] B. Pérez is older than Ms. Cabrera.  (Docket No. 54 at 2.)

[48] Based on the record before us, we note that her leadership of the region had been rocky from the start, and she testified that she had experienced problems with Durán, one of her subordinates, since the latter's arrival in the Arecibo office.  See supra Part I.B.  And while we did not credit her unsupported assertions of a conspiracy led by B. Pérez against her, their work relationship was also plagued with difficulties and Ms. Cabrera probably perceived Durán's closeness with B. Pérez as a threat to her position, but she has provided no factual support for her complot allegations.

1    See Rios-Jimenez v. Sec'y of Veterans Affairs, 520 F.3d 31, 43 (1st Cir. 2008) (finding

2    comments made in private by plaintiff's supervisor that if he were her he would leave her

3    position made "on only two occasions" insufficiently severe and pervasive).

4           Finally, she testified that Palés, first at the November meeting, and again in January

5    on the phone, referred to her as "vieja" ("old woman") and told her to "behave herself."  As

6    discussed above in Part III.A.2.ii., Palés comments are ambiguous in context,[49] and the First

7    Circuit has stated that remarks "that can plausibly be interpreted two different ways—one

8    discriminatory and the other benign—does not directly reflect illegal animus."  Patten v.

9    Wal-mart Stores E., Inc., 300 F. 3d 21, 25 (1st Cir. 2002).  We find that his two comments,

10   made three months apart, and in the context of her problematic conduct at work, constitute

11   offensive utterances at most.

12          Considering all the circumstances and the remarks in the record, we cannot find her

13   workplace was "'permeated with discriminatory intimidation, ridicule, and insult that [was]

14   sufficiently severe or pervasive to alter the conditions of . . . employment and create an

15   abusive working environment.'"  Rios-Jimenez, 520 F.3d at 43 (quoting  Quiles-Quiles v.

16   Henderson, 439 F.3d 1, 7 (1st Cir. 2006)).  Beyond the remarks discussed above, she has

17   provided no evidence of a hostile environment due to age discrimination.  Her interpersonal

18   problems in the company began well before reaching the protected age of forty, when she

---

[49] Additionally, the fall 2008 incident in which B. Pérez referred to Ms. Cabrera as a "sea urchin" and pondered aloud "how she could caress a sea urchin," (Docket No. 54 at 10), may have been deeply offensive to Ms. Cabrera, but we cannot find that it demonstrates a discriminatory animus.

1    was promoted.  She was never demoted, and she remained on the payroll until during her

2    three-month absence from work prior to her resignation.[50]  At most, the remarks in the record

3    were  isolated  or  offensive  utterances  in  the  context  of  her  behavior  and  interpersonal

4    problems, and  "federal employment discrimination laws do not establish a 'general civility

5    code' for the workplace."  Id. (quoting Quiles, 439 F.3d at 7.)  This claim, too, must fail.

6    **B.       Supplemental Commonwealth Claims**

7          The Supreme Court has stated that "if the federal claims are dismissed before trial, . . .

8    the state claims should be dismissed as well." United Mine Workers v. Gibbs, 383 U.S. 715,

9    726 (1966).  However, a "district court must exercise 'informed discretion' when deciding

10   whether to exercise supplemental jurisdiction over state law claims." Redondo Constr. Corp.

11   v. Izquierdo, 662 F.3d 42, 49 (1st Cir. 2011) (quoting Roche v. John Hancock Mut. Life Ins.

12   Co., 81 F.3d 249, 256–57 (1st Cir. 1996)).  This decision involves a weighing of various

13   factors,  including  comity,  judicial  economy,  convenience,  and  fairness.   Id. (citations

14   omitted).

15         Having considered these factors, we decline to exercise supplemental jurisdiction over

16   Plaintiffs' Commonwealth claims.  Both parties have focused their efforts here on the federal

17   claims; the Puerto Rico law issues have received far less attention.  Moreover, the discovery

---

[50] Moreover, she has not adequately established how or why she subjectively perceived these remarks as abusive.  As discussed in Part I.B., Ms. Cabrera made no mention of any type of discrimination: in her desperate February email to the Board of Director members, in the joint letter of resignation; in the lengthy 2009 letter from an attorney seeking payment for allegedly unpaid commissions, or to her psychiatrist during her years of SIF treatment (and was discharged from SIF treatment upon a determination that her condition was not related to a situation in the workplace).

Civil No. 10-1865 (JAF)                                                    -39-

1    and depositions were conducted in Spanish and are readily available for trial in the

2    Commonwealth courts.  See id. (emphasizing hardship resulting from need for translation of

3    "extensive discovery" into Spanish).

4                                              **IV.**

5                                        **<u>Conclusion</u>**

6          For the foregoing reasons, we hereby **GRANT** both of Defendants' motions for

7    summary judgment (Docket Nos. 53; 56), and **DISMISS** Plaintiffs' complaint (Docket No. 1)

8    in its entirety.

9          **IT IS SO ORDERED.**

10         San Juan, Puerto Rico, this 13th day of February, 2012.

11                                         s/José Antonio Fusté
12                                         JOSE ANTONIO FUSTE
13                                         U.S. District Judge